**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF RHODE ISLAND**

ATAHIR MAHMOUD; GERARD MAYETELA; LYUBOV KODENTSOVA; SVITLANA PECHERSKYKH, by and through her next friend, TETIANA SAMOILOVA; M.E., a minor, by and through his next friend, SARA HAMDI, each individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

MEHMET OZ, in his official capacity as the Administrator for Centers for Medicare and Medicaid Services,

CENTERS FOR MEDICARE & MEDICAID SERVICES,

ROBERT F. KENNEDY JR., in his official capacity as Secretary of the United States Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendants*.

Case No.

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs and proposed class members are some of our nation's most vulnerable individuals: impoverished elderly and disabled recipients of monthly Supplemental Security Income (SSI) payments who are lawfully present in the United States—as asylees, refugees, parolees, or victims of trafficking and domestic violence—and who are classified as categorically needy and entitled to Medicaid coverage. Yet they now are without Medicaid—rationing medication, cancelling surgeries, and missing preventative care appointments, with no ability to pay—after Defendants unlawfully directed states to terminate their Medicaid benefits, due to their immigration status.

2. On April 8, 2026, and in subsequent instructions on July 31, 2026, and August 14, 2026, the Centers for Medicare & Medicaid Services (CMS), the division of the United States Department for Health and Human Services (HHS) responsible for implementing laws passed by Congress related to Medicaid, instructed states to terminate Medicaid funding, effective October 1, 2026, for all lawfully present asylees, refugees, parolees, trafficking and abuse victims. When taking this action, referred to in this Complaint as Defendants' SSI Medicaid Exclusion, the agency cited recent federal legislation known as "H.R. 1."

3. Defendants' SSI Medicaid Exclusion violates the Administrative Procedure Act (APA) by acting without statutory authority and in direct contradiction of Congress' unambiguous statutory mandate—under the Medicaid Act and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PROWRA)—to provide the "same" federally-funded Medicaid benefits to all SSI

recipients, regardless of immigration status. 8 U.S.C. § 1612(b)(2)(F). As acknowledged by CMS, H.R. 1 did not amend or repeal this provision.

4. Defendants' SSI Medicaid Exclusion is already causing direct and profound harm to Plaintiffs—lawfully-present noncitizen SSI recipients and residents of Rhode Island, Illinois, Missouri, and South Carolina—as well as thousands of putative class members from across the nation. Plaintiffs and proposed class members relied on Medicaid to manage their chronic and disabling conditions and to maintain their health and independence. Since their coverage was terminated on October 1, 2026, they have been unable to afford the medical care and services they need. On December 31, 2026, following Defendants' instruction, states will submit State Plan Amendments, memorializing the exclusion of Plaintiffs and the class from Medicaid.

5. To prevent further harm to Plaintiffs and similarly situated individuals, Defendants' guidance and instructions must be vacated, set aside, and declared unlawful. Defendants should further be enjoined from implementing the SSI Medicaid Exclusion through any other means.

## PARTIES

6. **Plaintiff Atahir Wadalfhakih Mahmoud** is a 69-year-old man living in Providence, Rhode Island with his wife and two minor children. He was born in Sudan and arrived in the United States as a refugee in February 2024. His application for his green card is pending. He qualifies for and receives SSI payments. Until October 1, 2026, he relied on Medicaid benefits for medical care, including medication, for a range of health issues, including knee pain, type 2 diabetes, high-blood pressure, high cholesterol, and prostate and stomach pain. He lost Medicaid benefits, effective

October 1, 2026, pursuant to Defendants' SSI Medicaid Exclusion, causing him substantial and irreparable harm.

7. **Plaintiff Gerard Mayetela** is a 77-year-old man living in Providence, Rhode Island, with his wife and adult son. He and his family fled to the United States from the Republic of Congo as a refugee in 2024, and his application for his greed card is pending. He qualifies for and receives SSI payments. Until October 1, 2026, he relied on Medicaid benefits for medical care, including medications, for a range of health issues, including vision impairments and high blood pressure. He lost Medicaid benefits, effective October 1, 2026, pursuant to Defendants' SSI Medicaid Exclusion, causing him substantial and irreparable harm.

8. **Plaintiff Lyubov Kodentsova** is an 89-year-old Uzbekistani woman living in Champaign, Illinois, with her adult daughter, Valentina Chupik. Ms. Kodentsova was granted asylum in the United States in 2023. She qualifies for and receives SSI benefits. Until October 1, 2026, she relied on Medicaid coverage for a range of health issues, including chronic heart failure, bradycardia, shortness of breath, osteoporosis, and dementia. Medicaid also paid Valentina to provide support with Ms. Kodentsova's activities of daily living, including eating, bathing, dressing, transferring in and out of bed, and taking medications. Ms. Kodenstova lost Medicaid benefits effective October 1, 2026, pursuant to Defendants' SSI Medicaid Exclusion, causing her substantial and irreparable harm.

9. **Plaintiff Svitlana Pecherskykh** is a 78-year-old woman who lives in Boiling Springs, South Carolina. She and her family fled the war in Ukraine and

entered the United States as humanitarian parolees through the United for Ukraine (U4U) program. She qualifies for and receives SSI benefits. Until October 1, 2026, she relied on Medicaid coverage for a range of medical conditions including Alzheimer's, high blood pressure, type 2 diabetes, gastric reflux, and urinary incontinence, and for in-home assistance with activities of daily living. She lost Medicaid benefits, effective October 1, 2026, because of Defendants' SSI Medicaid Exclusion, causing her substantial and irreparable harm. She brings this case by and through her adult daughter and Next Friend, Tetiana Samoilova.

10. **Plaintiff M.E.** is an 11-year-old child who lives in Saint Louis, Missouri. His parents fled Syria because of the civil war, and he and his three siblings were born in Turkey and then entered the United States as refugees in December 2024. He has been diagnosed with global developmental delay, enuresis, encopresis, kidney malformation, and congenital malformation of genitalia. He qualifies for and receives SSI benefits. Until October 1, 2026, his family had been relying on his Medicaid coverage for his multiple doctors' visits, surgeries, diapers, and prescription medications. He lost Medicaid benefits, effective October 1, 2026, because of Defendants' SSI Medicaid Exclusion, causing him and his family substantial and irreparable harm, including putting off necessary surgery. He brings this action by and through his mother and next friend, Sara Hamdi.

11. **Defendant Mehmet Oz** is the Administrator for the Centers for Medicare & Medicaid Services. He is sued in his official capacity.

12. **Defendant the Centers for Medicare & Medicaid Services** (CMS) is an operating division of HHS, headquartered in Maryland. CMS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

13. **Defendant Department of Health and Human Services** (HHS) is a cabinet department of the United States federal government, headquartered in Washington, D.C. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). HHS has responsibility for implementing the Medicaid program consistent with the Medicaid Act.

14. **Defendant Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services. He is sued in his official capacity.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action because this action arises under the Constitution and laws of the United States. 28 U.S.C. § 1331. The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 705–706, 28 U.S.C. §§ 1651, 2201–2202, and its equitable powers. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

16. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action in which one of the defendants is an agency of the United States, there is no real property involved in this action, and Plaintiffs Atahir Mahmoud and Gerard Mayetela reside in this District.

## FACTUAL ALLEGATIONS

### I. Legal Background

#### A. The Medicaid Program

17. Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 *et seq*.

18. Medicaid's purpose is to enable each state, as far as practicable, to furnish "medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396-1.

19. "'[M]edical assistance' means payment of part or all of the cost of the following care and services or the care and services themselves, or both . . . ." *Id.* § 1396d(a) (listing care and services states must or can cover).

20. States and the federal government share responsibility for funding Medicaid. The HHS Secretary must pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id.* §§ 1396b(a)(1), 1396d(b). The proportion of the federal share is based on each state's relative per capita income and is referred to as the "Federal medical assistance percentage" (FMAP). *Id.* § 1396d(b). The federal share is also referred to generally as "Federal Financial Participation" (FFP).

21. In return for federal funding, participating states must pay the remaining portion of the costs of care and follow all federal requirements, including those regarding the scope of eligibility for the program. *Id.* §§ 1396-1, 1396a(a)(10), 1396b.

22. Under the Medicaid Act, participating states must submit a Medicaid "State plan" for the Secretary's approval. *Id.* § 1396a. An approved Medicaid plan

must describe the state's Medicaid program and affirm its commitment to comply with requirements imposed by federal law. 42 C.F.R. § 430.10; s*ee generally* 42 U.S.C. §§ 1396-1, 1396a.

23. Although states do not have to participate in Medicaid, all states do.

**B. Categorical Medicaid Eligibility**

24. The Medicaid Act identifies population groups that states must cover and gives states the option to cover additional population groups. 42 U.S.C. §§ 1396a(a)(10)(A), (C).

25. Mandatory Medicaid population groups include: children; parents and other caretaker relatives; pregnant women; and the elderly, blind, and disabled. *Id.* § 1396a(a)(10)(A)(i).

26. With regard to mandatory elderly, blind, and disability categories, states must provide Medicaid to all persons receiving SSI benefits from the Social Security Administration (SSA) unless the state has exercised what is referred to as the "209(b) option." *Id*. § 1396a(a)(10)(A)(i)(II)(aa), (f).

27. The 209(b) option permits states to apply more restrictive age, income, or disability criteria than are used by the SSI program when determining eligibility for the mandatory disability categories. 42 U.S.C. § 1396a(f); 42 C.F.R. § 435.121. These criteria cannot be more restrictive than the criteria the state had in place on January 1, 1972. 42 U.S.C. § 1396a(f); 42 C.F.R. § 435.121(a)(2). States must provide medical assistance to individuals meeting the state's selected criteria under 209(b). 42 U.S.C. § 1396a(f); 42 C.F.R. § 435.121(a)(1).

28. Eight states exercise the 209(b) option: Illinois, Missouri, Connecticut, Hawaii, Minnesota, New Hampshire, North Dakota, and Virginia. Soc. Sec. Admin., Program Operations Manual System (POMS), SI 01715.010, Medicaid and the Supplemental Security Income Program, https://secure.ssa.gov/poms.nsf/lnx/0501715010 (last visited Nov. 23, 2026).

29. In the remaining, non-209(b) states, the state must make "medical assistance" available to "all individuals . . . with respect to whom [SSI] benefits are being paid." 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa).

30. HHS regulations also require states to "provide Medicaid to aged, blind, and disabled individuals or couples who are receiving . . . SSI." 42 C.F.R. § 435.120.

31. To be eligible for SSI, an individual must be age 65 or older, blind, or "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A), (a)(3)(A). In addition, the individual must meet low-income restrictions and cannot have total resources (e.g., bank accounts, property) that exceed $2,000 for a single person, or $3,000 for a married couple. *Id.* § 1382(a)(1)–(3).

32. The Social Security Act includes a provision that allows states to streamline Medicaid and SSI eligibility determinations. *Id.* § 1383c(a). Under Section 1634 of the Social Security Act, states can enter into agreements with the SSA to "determine eligibility for medical assistance in the case of aged, blind, or disabled individuals

under such State's plan approved under [Title] XIX." *Id.* In these states, an individual submits a single application for SSI benefits and Medicaid eligibility, which is reviewed and determined by SSA.

33. Most states, including Rhode Island and South Carolina, have a "1634 agreement" with SSA.

34. When SSA makes eligibility determinations for SSI applicants, it notifies the state that the individual is eligible for Medicaid, and states then enroll the individual in the Medicaid program.

35. Once eligible for Medicaid, individuals are entitled to receive the full range of covered Medicaid services in their states when they are medically necessary. This includes physician and clinic services; all states have also opted to cover, for example, medications and home and community-based long-term care services.

**C. The Personal Responsibility and Work Opportunity Reconciliation Act**

36. In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA). Pub. L. No. 104-193, 110 Stat. 2105 (1996).

37. PRWORA significantly narrowed which lawfully present noncitizens could receive federal public benefits, including Medicaid and SSI. 8 U.S.C. §§ 1612(a), (b).

38. Generally speaking, PRWORA limits eligibility for these programs to what it labels "qualified" immigrants, those who are lawful permanent residents (LPR) (who meet certain waiting periods or have 40 quarters of work), refugees, asylees, individuals granted withholding of removal, Cuban-Haitian Entrants, Amerasian

immigrants, certain abused spouses and children, and human trafficking victims. *Id.; see also id.* § 1641(c) (defining "qualified" immigrants).

39. PRWORA expressly addresses the intersection of SSI and Medicaid eligibility for non-citizens, mandating:

> An alien who is receiving benefits under the program defined in subsection (a)(3)(A) (relating to the supplemental security income program) **shall** be eligible for medical assistance under a State plan under title XIX of the Social Security Act (42 U.S.C. 1396 *et seq.*) **under the same terms and conditions** that apply to other recipients of benefits under the program defined in such subsection.

*Id.* § 1612(b)(2)(F) (emphasis added).

40. In other words, PRWORA mandates that all non-citizens who are receiving SSI, including those groups listed above, have the same access to "medical assistance under a State [Medicaid] plan" as other non-immigrant recipients of SSI.

41. Section 1612(b)(2)(F) was enacted in 1997, the year after PRWORA was initially passed, in response to bipartisan concerns about this vulnerable population. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 5305(b), 111 Stat. 251, 601 (codified at 8 U.S.C. § 1612(b)(2)(F)). As Senator John McCain of Arizona explained, PRWORA "denied certain forms of public assistance to legal immigrants who were residing in this country prior to enactment of the legislation" in 1996, and the 1997 amendment to PRWORA restored SSI and Medicaid eligibility for "certain legal immigrants and refugees" who are disabled or elderly to "provide necessary safeguards for these vulnerable populations." *See* 143 CONG. REC. S8493-01, S8496143 Cong. Rec. S8493, S8496 (daily ed. July 31, 1997) (statement of Sen. McCain).

42. Pursuant to 8 U.S.C. § 1612(b)(2)(F), all states, including those with 209(b) options, must provide SSI recipients with the same access to Medicaid coverage as citizens, regardless of immigration status.

**D. H.R. 1**

43. On July 4, 2025, Congress enacted a budget reconciliation bill, also referred to as "H.R. 1" or the One Big Beautiful Bill Act (OBBA) or the Working Families Tax Cut (WFTC) Legislation. *See* Pub. L. No. 119-21, 139 Stat. 72 (2025).

44. Section 71109 of H.R. 1 added 42 U.S.C. § 1396b(v)(5) to the Medicaid Act. This paragraph states, "Notwithstanding the preceding paragraphs of this subsection, beginning on October 1, 2026, except as provided in paragraphs (2) and (4), in no event shall payment be made to a State under this section for medical assistance" for individuals who are not a citizen, lawful permanent resident (LPR), Cuban or Haitian entrant, or resident under the Compact of Free Association (COFA). Pub. L. No. 119-21, § 71109, 139 Stat. 72, 297 (2025) (codified at 42 U.S.C. § 1396b(v)(5)). The exceptions in paragraphs (2) and (4) concern emergency medical care and coverage of lawfully residing children and pregnant individuals under an optional coverage provision added by section 214 of the Children's Health Insurance Program Reauthorization Act of 2009.

45. Nowhere does H.R. 1 modify non-citizen eligibility for SSI payments or amend the "same terms" mandate in 8 U.S.C. § 1612(b)(2)(F). In short, Congress left the Medicaid eligibility of SSI noncitizens untouched.

**E. CMS' Misinterpretation of H.R. 1**

46. On April 8, 2026, CMS issued a letter to State Health Officials in every state (the SHO Letter) regarding implementation of H.R. 1 Section 71109. Ltr. from Dan Brillman, Deputy Admin., CMS, to State Health Officials (April 8, 2026), attached hereto as Exhibit 1.

47. The SHO Letter correctly acknowledged that Section 71109 "did not amend the description in 8 U.S.C. § 1612(b)(2) of the populations to which states must provide full Medicaid benefits, nor did it amend the description or scope of the populations in section 1902 of the Act [42 U.S.C. § 1396a] to which states are required to provide medical assistance (e.g., individuals to whom supplemental security income (SSI) benefits are being paid)." Ex. 1 at p. 6.

48. Nonetheless, the SHO Letter creates a new category of "FFP-eligible noncitizens," which is limited to the three statuses listed in Section 71109, namely LPRs, Cuban/Haitian entrants, and COFA migrants. *Id.* at 4; *see id.* at 23–28 (appendix listing availability of FFP for full Medicaid benefits and not indicating any exemptions for SSI recipients).

49. As a result, notwithstanding PRWORA's mandate to provide the same "medical assistance" to all SSI recipients, the SHO Letter excludes non-citizen SSI recipients from the definition of FFP-eligible noncitizens. *Id.* at 3–4, 6–7.

50. Directly contrary to PRWORA's mandate, the SHO Letter states that as of October 1, 2026, FFP "will not be available" for noncitizen SSI recipients who lack one of the three immigration statuses listed in Section 71109. *Id* at 7, 18.

51. CMS is requiring all states to submit a State Plan Amendment (SPA) that indicates these population groups have been excluded no later than December 31, 2026, to be retroactively effective October 1, 2026. *Id.* at 20.

52. On July 31, 2026, two months before the October 1, 2026, implementation deadline, CMS issued further guidance, "State Implementation Tool: Section 71109 of the Working Families Tax Cut (WFTC) Legislation" (Implementation Tool), attached hereto as Exhibit 2.

53. The Implementation Tool repeats the SHO Letter's definition of "FFP-eligible noncitizen." Ex. 2 at 1. The Tool further specifies that "potentially affected beneficiaries," include those "who are Supplemental Security Income (SSI) recipients." *Id.* at 2. It further instructs 1634 states—who rely on SSA's Medicaid eligibility determinations—to "ensure systems are programmed to consume SSA data that identifies SSI recipients who are FFP-eligible noncitizens and, if applicable, accurately determine eligibility for SSI noncitizen recipients." *Id.* at 4.

54. The Implementation Tool cautions that if states cannot ensure their claiming practices comply with Defendants' interpretation of H.R. 1, "the state must not submit FFP claims for potentially affected beneficiaries until the state completes all of the necessary actions." *Id.* at 7.

55. On August 14, 2026, CMS issued further guidance, "Technical Guide: Implementation of Section 711109 of Working Families Tax Cut (WFTC) Legislation and Supplemental Security Income (SSI) Recipients" (Technical Guide), attached hereto as Exhibit 3.

56. The Technical Guide requires states to "make any and all necessary changes to ensure proper FFP claiming in accordance with section 1903(v)(5) [42 U.S.C. § 1396b(v)(5)] of the Act" which "includes potentially affected beneficiaries who are SSI recipients." *Id.* at 3. Defendants require states to determine Medicaid eligibility for SSI recipients and to verify immigration status to "identify potentially affected beneficiaries" for termination of benefits. *Id.* at 3–5.

57. Without identifying what language in H.R. 1 demonstrates congressional intent to nullify prior legislation entitling SSI recipients to Medicaid coverage, Defendants, through the SHO Letter, Implementation Tool, and Technical Guide, (collectively SSI Medicaid Exclusion), announced a sweeping cut of SSI recipients' life-sustaining healthcare benefits.

58. Thousands of current noncitizen SSI recipients across the country lost Medicaid coverage effective October 1, 2026, as a result of Defendants' SSI Medicaid Exclusion. A preliminary injunction is prohibiting implementation of Defendants' SSI Medicaid Exclusion in Washington State. *See Neighborhood House v. U.S. Dep't of Health & Hum. Servs.*, No. 2:26-cv-03006, 2026 WL 2935933 (W.D. Wash. Sept. 30, 2026).

**F. Defendants' SSI Medicaid Exclusion Is a Final Agency Action**

59. The SSI Medicaid Exclusion constitutes a final agency action within the meaning of the APA, 5 U.S.C. § 704.

60. The SSI Medicaid Exclusion marks the consummation of Defendants' decision-making on immigration status criteria for Medicaid funding.

61. The SSI Medicaid Exclusion determines the rights of categories of noncitizen SSI recipients to Medicaid-funded services, it determines the rights and obligations of the states regarding federal financial spending for those noncitizen SSI recipients, and legal consequences flow from the agency's actions, including the termination of eligibility for Medicaid-funded services for certain categories of noncitizen SSI recipients.

62. The SSI Medicaid Exclusion reflects a definitive statement of HHS policy that certain noncitizen SSI recipients are no longer eligible for Medicaid-funded services.

63. As of October 1, 2026, and pursuant to Defendants' SSI Medicaid Exclusion, Rhode Island, Illinois, Missouri, South Carolina and states across the country are denying Medicaid coverage to, and have stopped claiming FFP, for these beneficiaries.

## Plaintiffs

### A. Plaintiff Atahir Mahmoud

64. Atahir Mahmoud is a 69-year-old man who lives in Providence, Rhode Island, with his wife and two minor children. *See* Declaration of Atahir Mahmoud (Mahmoud Decl.), attached hereto as Exhibit 4, ¶¶ 3, 6.

65. Mr. Mahmoud was born in Sudan. *Id.* ¶ 3. He fled the ongoing civil war in Sudan, fleeing first to Chad, then to Cameroon, until he and his family arrived in the United States as refugees in February 2024. *Id.* ¶ 4.

66. Mr. Mahmoud was found eligible for and began receiving SSI benefits in August 2024. He currently receives $987 per month. *Id.* ¶ 7.

67. Together with his wife's employment income, they receive less than $2,400 per month, and need to support their two minor children, with monthly rent of $1,500,

along with costs of utilities, groceries, car insurance, gas, phone, and laundry. *Id.* ¶ 16.

68. Until October 1, 2026, he was receiving Medicaid coverage in Rhode Island. *Id.* ¶ 8.

69. On September 26, 2026, he received a letter from the State of Rhode Island, stating that his Medicaid coverage would end as of October 1, 2026, because his "citizenship/immigration status does not qualify you for this program." *Id.* ¶ 8, Exhibit A.

70. The letter also stated that his State Supplemental Payment would end as of November 1, 2026. *Id.* As a result, Mr. Mahmoud's Medicaid coverage ended on October 1, 2026, and his SSP benefits ended on November 1, 2026. *Id.* ¶ 8.

71. Nothing about Mr. Mahmoud's age, income, resources or household changed before his Medicaid ended. *Id.* ¶ 9.

72. While he filed an appeal of the termination of the Medicaid health coverage, he is not receiving any coverage during the appeal, and he does not qualify for any other health coverage that he is aware of. *Id.* ¶¶ 10–11.

73. Mr. Mahmoud suffers from severe knee pain that he regularly sees a doctor for and receives pain medications and injections. *Id.* ¶ 12. He had an appointment with his doctor scheduled for November 17, 2026, to discuss his pain management options, which he did not go to, because he could not afford the appointment. *Id.* Because he no longer has Medicaid, that appointment would have cost him $985.65 out of pocket, which is essentially his entire months' worth of SSI benefits, leaving

him with no money to pay for rent, utilities, food, and other necessary monthly expenses. *Id.*

74. In addition to his chronic knee pain, Mr. Mahmoud has numerous health conditions that require ongoing treatment, medication and monitoring, including type 2 diabetes, high blood pressure, high cholesterol, and prostate and stomach pain. *Id.* ¶ 14. He requires 12 medications for all of his health issues and needs to test his blood-glucose daily. *Id.*

75. Since his Medicaid ended, he has not seen a doctor. *Id.* ¶ 15. He has switched to a generic form of his medications, but that still costs him about $40 per month, which is a significant amount for him to pay. *Id.*

76. Without Medicaid or any way to pay for his medications, he has started rationing several of his medications, including the ointment for his knee pain and medication for his prostate pain. *Id.* ¶ 17. He is scared of what will happen when he is no longer able to afford his medications because, if left untreated or unmedicated, he could get very sick or die. *Id.* And if his health worsens, his only option for care would be emergency care and hospitalization. *Id.* ¶ 19.

**B. Plaintiff Gerard Mayetela**

77. Gerard Mayetela is a 77-year-old man who lives in Providence, Rhode Island, with his wife and son. *See* Declaration of Gerard Mayetela (Mayetela Decl.), attached hereto as Exhibit 5, ¶¶ 3, 6.

78. Mr. Mayetela was born in the Republic of Congo, but because of ongoing war and violence, he and his family fled. *Id.* ¶ 4. He arrived in the United States as a refugee in April 2024. *Id.*

79. He was found eligible for and began receiving SSI benefits in July 2024 and he currently receives $467.25 each month. *Id.*

80. Until October 1, 2026, he was receiving Medicaid coverage in Rhode Island. *Id.* ¶ 8.

81. Paying out of pocket for healthcare without Medicaid is impossible for Mr. Mayetela, whose only source of income is $487 per month in SSI benefits. *Id.* ¶ 14. His wife also relies on monthly SSI benefits. *Id.* Their monthly income covers their rent and utilities, but they already rely on food pantries for food, as they do not have enough money for food, let alone for medical care. *Id.*

82. On September 4, 2026, he received a letter from the State of Rhode Island, stating that his Medicaid coverage would end as of October 1, 2026, because he "did not meet the immigration requirements for Medicaid." *Id.* ¶ 8, Exhibit A. As a result, his Medicaid coverage ended on October 1, 2026, and he is currently without health insurance. *Id.* ¶¶ 8, 11.

83. Mr. Mayetela has multiple medical issues that require access to routine healthcare. *Id.* ¶ 12. He has high blood pressure, which requires daily medication, that he is now rationing to two to three tablets per week, instead of daily, because he will not be able to afford it once it runs out. *Id.* He also has problems with his vision, for which he regularly sees an optometrist. *Id.* ¶ 13. He had to cancel his appointment

scheduled for October 14, 2026, because he could not afford the $150 cost of the appointment. *Id.*

84. He is afraid that his medical conditions will get worse without regular care and medication. *Id.* ¶ 17. If his vision problems remain undiagnosed and untreated, he could go completely blind. *Id.* And without daily blood pressure medication, he is afraid that he could get really sick or even die. *Id.*

**C. Plaintiff Lyubov Kodentsova**

85. Lyubov Kodentsova is an 89-year-old woman who lives in Champaign, Illinois, with her adult daughter Valentina Chupik. Both she and her daughter are citizens of Uzbekistan. *See* Declaration of Lyubov Kodentsova (Kodentsova Decl.), attached hereto as Exhibit 6, ¶¶ 2, 3.

86. Ms. Chupik is a human rights worker who investigated human trafficking schemes in both Uzbekistan and Russia. *Id.* ¶ 3. Valentina had to leave Uzbekistan in 2006 after being threatened by the Security Service of Uzbekistan. *Id.* ¶ 4. She relocated to Russia and Ms. Kodentsova followed her there in 2008. *Id.*

87. Valentina continued her human rights work in Russia, and as a result, was detained and deported to Armenia in 2021. *Id.* ¶ 5. Ms. Kodentsova was also targeted. *Id.* ¶ 6. Individuals repeatedly came to her house, threatening her with violence. *Id.* Fortunately, volunteers helped protect her and help her escape to meet Valentina in Armenia in November 2021. *Id.*

88. Ms. Kodentsova and Valentina arrived in the United States in 2023 and applied for asylum in June of that year. *Id.* ¶ 7. Their asylum applications were granted on October 7, 2025. *Id.* ¶ 8.

89. Ms. Kodentsova was found eligible for and began receiving SSI benefits in December 2025. She currently receives $994 each month. *Id.* ¶ 9.

90. Until October 1, 2026, she was receiving Medicaid coverage in Illinois. *Id.* ¶ 10.

91. Ms. Kodentsova received a notice, dated August 26, 2026, stating that Ms. Kodenstova's Medicaid benefits would end on September 30, 2026 because she "does not meet U.S. citizenship or immigration requirements." *Id.* ¶ 11, Exhibit A.

92. The August 26, 2026 notice also discussed Illinois' state-funded medical program, called Health Benefits for Immigrant Adults. It stated that "Due to the limit on funds available for the Health Benefits for Immigrant Adults program no new applicants are being enrolled at this time." *Id.*

93. As a result, Ms. Kodentsova lacks any health insurance coverage. *Id.*

94. Ms. Kodentsova has numerous medical conditions that require ongoing treatment and monitoring including chronic heart failure, bradycardia, paroxysmal atrial fibrillation causing irregular heart rhythm, edema, shortness of breath (dyspnea), osteoporosis, high blood pressure, cataracts, a pancreatic lesion, lung and thyroid nodules, an enlarged thyroid, hepatic steatosis (also known as fatty liver disease), and dementia. *Id.* ¶ 13.

95. She takes approximately 10 prescription medications to help manage her conditions, including Eliquis, a blood thinner to help prevent clots and strokes, and metoprolol, to maintain a normal heart rhythm. *Id.* ¶ 14.

96. She also requires regular medical appointments, including monitoring her heart health every three months, twice annual visits to an endocrinologist, and regular physical therapy. *Id.* ¶ 15.

97. She requires substantial assistance with activities of daily living, including assistance with eating, bathing, grooming, dressing, transferring from sitting to standing or in and out of bed, toileting, and taking medication. *Id.* ¶ 16.

98. When Ms. Kodentsova was enrolled in Medicaid, it covered her necessary medical care including medications, doctors' appointments, and tests. *Id.* ¶ 17. Ms. Kodentsova was approved to receive 148.25 hours of in-home assistance each month to help her with activities of daily living. *Id.* Her daughter, Ms. Chupik, served as her paid caregiver for those hours. *Id.*

99. Without those paid caregiving hours, Ms. Kodentsova's SSI benefits are the family's only source of income. *Id.* ¶ 18. Ms. Chupik is still providing the assistance her mother needs, but cannot take a job out of the home, given her mother's needs. *Id.* ¶¶ 18, 22. She is attempting to find remote work that she can complete while performing those duties. *Id.* ¶ 22. But, to date, she has not been able to locate work that can accommodate her caregiving schedule, leaving the family to rely solely on Ms. Kodenstova's monthly SSI benefits. *Id.* ¶¶ 18, 22.

100. With their limited income, the family has no realistic means to afford to pay for Ms. Kodenstova's medications, specialist appointments, or other needed medical care such as tests and labs. *Id.* ¶¶ 19–21. Ms. Kodentsova's Eliquis, for example, costs $400 for a 15-day supply. *Id.* ¶ 19. Without that medication, Ms. Kodentsova is at increased risk for blood clots or a stroke, which could be fatal. *Id.*

101. The family has made efforts to find free and discounted care. *Id.* ¶¶ 20–21. They have found free primary care at a local community health clinic, but that clinic cannot offer the heart monitoring Ms. Kodentsova needs and does not have an endocrinologist on staff. *Id.* ¶ 21.

102. Valentina also secured a donation from the manufacturer of Eliquis to cover a 90-day supply, but the family does not know if the discount will extend it beyond that. *Id.* ¶ 19. They have applied for discount programs for the other medications, but they still cost almost $69 a month. *Id.* ¶ 20.

103. Ms. Kodenstova is dependent on several of her medications. *Id.* ¶ 14. She worries that without them, she could die. *Id.* ¶¶ 19–20. For instance, one medication, metoprolol is necessary to maintain her heartbeat at a normal rhythm and pulse, and she has previously experienced a dangerously low pulse when her refill of that medication was delayed. *Id.* ¶ 20. If she were to go without this medication for an extended period, she could experience dizziness, fainting, or even damage to her heart or other organs. *Id.*

104. Without Medicaid coverage, Valentina may be forced to work outside the home to pay for the medications. *Id.* ¶ 22. This will leave Ms. Kodentsova without the

help she needs to get in and out of bed, eat, or go to the bathroom, putting her at risk of falling and injuring herself. *Id.*

**D. Plaintiff Svitlana Pecherskykh**

105. Svitlana Pecherskykh is 78-years-old and lives in Boiling Springs, South Carolina. *See* Declaration of Tetiana Samoilova (Samoilova Decl.), attached hereto as Exhibit 7, ¶ 2. She brings this case by and through her adult daughter and Next Friend, Tetiana Samoilova, who has durable power of attorney for Ms. Pecherskykh. *Id.* ¶ 14, Exhibit A.

106. Ms. Pecherskykh lives with Tetiana, as well as Tetiana's husband, Yurri, and Tetiana's two adult sons, Andrii and Yevhenii. *Id.* ¶ 2. They are all citizens of Ukraine and fled because of the war. *Id.* ¶ 3.

107. The war was terrible. *Id.* ¶¶ 4–7. There were constant attacks and sirens going off all the time. *Id.* ¶ 4. The war was especially difficult for Ms. Pecherskykh's 34-year-old grandson, Andrii, who has intellectual disabilities and phenylketonuria. *Id.* ¶¶ 6–7. Phenylketonuria is a rare genetic condition that makes it difficult to metabolize an amino acid that appears in foods with protein. *Id.* ¶ 6. When the amino acid builds up in the body it can cause permanent brain damage and psychiatric effects. *Id.* It is treated with medication and special dietary formula to avoid the amino acid. *Id.* The war made it very difficult to maintain Andrii's nutritional needs. *Id.* Andrii also began having panic attacks after every siren and was shaking constantly. *Id.* ¶ 7.

108. After enduring a year of the war, the family decided to leave. *Id.* ¶ 5. They were all granted humanitarian parole through the Uniting for Ukraine (U4U) program. *Id.* ¶ 9.

109. Ms. Pecherskykh began receiving SSI benefits in May or June of 2023, a few months after arriving in the United States. *Id.* ¶ 11.

110. She also began receiving Medicaid coverage at that time. *Id.* ¶ 12.

111. She is still receiving SSI benefits but lost her Medicaid coverage effective October 1, 2026. *Id.* ¶¶ 11, 23.

112. She received a notice from the South Carolina Department of Health and Human Services, dated September 12, 2026, stating that as of October 1, 2026, she was no longer eligible for Medicaid because "it appears that you are not a U.S. citizen, U.S. National or Qualified Lawfully Present Alien and do not meet the criteria for full Medicaid." *Id.* ¶ 15, Exhibit B.

113. An appeal challenging the decision to end Ms. Pecherskykh's Medicaid coverage was dismissed on November 9, 2026. *Id.* ¶ 21. The hearing officer found that Ms. Pecherskykh is not eligible for Medicaid based on her immigration status. *Id.*

114. Tetiana argued that Ms. Pecherskykh should still be eligible because she receives SSI and presented the case of *Neighborhood House and Mariia Matsai v. U.S. Department of Health and Human Services*, No. C26-3006 TSZ, Doc. 28 (W.D. Wash. Sept. 30, 2026). *Id.* ¶ 22. But the hearing officer said that decision wasn't binding in South Carolina. *Id.*

115. Ms. Pecherskykh has been without coverage since October 1, 2026 and has no other health insurance. *Id.* ¶ 23.

116. Without Medicaid coverage, Ms. Pecherskykh cannot obtain necessary medical care. *Id.* ¶ 16. She was receiving regular infusion therapy for her Alzheimer's twice a month. *Id.* Since October 1, 2026, she has stopped receiving the infusions because the family cannot afford them. *Id.*

117. Ms. Pecherskykh also has high blood pressure, insomnia, urinary incontinence, reflux, and type 2 diabetes and relies on approximately 10 prescription medications to manage those conditions. *Id.* ¶ 17. And although Tetiana is trying to find discounted or free prescriptions, she has not been successful yet. *Id.* She applied for free medications from the Welvista program but was denied. *Id.* So, currently, the family is paying in cash and is only purchasing the most important of Ms. Pecherskykh's medications and foregoing others. *Id.*

118. Ms. Pecherskykh was also receiving 80 hours of in-home caregiving each month through Medicaid, which the family now has to do without. *Id.* ¶ 20.

119. This is particularly challenging because Tetiana must also serve as the primary caregiver for her son Andrii and her husband Yurii, who each have disabilities that require supervision and assistance with daily activities. *Id.* ¶ 27.

120. Both Andrii and Yurii receive SSI based on their disabilities. *Id.* ¶ 24. Both also received notices that their Medicaid would end because of their immigration status. *Id.* ¶ 26. Tetiana filed appeals for them as well, which are still pending, but she expects they will be dismissed as her mother's was. *Id.*

121. Yurii has severe dementia, as well as other conditions including high blood pressure, insomnia, GERD, and urinary incontinence. *Id.* ¶ 25. He often does not recognize familiar people, becomes disoriented even in the home, cannot reliably find or use the bathroom without assistance, and cannot manage his own medicines or daily activities. *Id.* He has fallen and stumbled; he walks around the house at night; he requires constant supervision to prevent injury or wandering. *Id.*

122. Tetiana is now serving as the primary caregiver for three people with disabilities, her mother who has Alzheimer's, her husband with dementia, and her son with an intellectual disability. *Id.* ¶ 27. She cannot safely leave them alone to go to the pharmacy or grocery store. *Id.* Taking all three with her also creates a serious risk that one may wander away or become lost. *Id.* She cannot maintain outside employment while meeting their needs, and she has no dependable respite. *Id.* The only person who can help is her youngest son, Yevhenii, on Saturdays and Sundays when he is not working. *Id.* On those days, Tetiana provides care for a young boy with Down Syndrome to provide some additional income. *Id.* But it is not enough. *Id.*

123. The loss of Medicaid is causing profound exhaustion, loss of sleep, and emotional burnout for Tetiana and putting the health and well-being of Ms. Pecherskykh and her family members at serious risk. *Id.* ¶ 28.

**E. Plaintiff M.E.**

124. M.E. is an 11-year-old child who lives in Saint Louis, Missouri. *See* Declaration of Sara Hamdi (Hamdi Decl.), attached hereto as Exhibit 8, ¶¶ 3, 7. He

is a minor and brings this case by and through her mother and Next Friend, Sara Hamdi. *Id.*

125. His parents are from Syria and they fled to Turkey in 2015 because of the civil war. *Id.* ¶ 4. He and his three siblings were born in Turkey, and the family all relocated to the United States in December 2024, after being granted refugee status. *Id.* ¶¶ 4–5.

126. M.E. was born with kidney malformation and congenital malformation of genitalia, requiring his first surgery at only three days old. *Id.* ¶¶ 7–8. He also has been diagnosed with global developmental delay, enuresis, and encopresis. *Id.* ¶ 7.

127. Based on his disabilities, M.E. was found eligible for and began receiving SSI benefits in October 2025, and he currently receives $994 each month. *Id.* ¶ 10.

128. Until October 1, 2026, he was receiving Medicaid coverage in Missouri. *Id.* ¶ 11, 15.

129. His family received a notice from the Missouri Department of Social Services Family Support Division, dated September 29, 2026, stating that M.E.'s Medicaid coverage would be ending October 1, 2026 "due to changes in immigrant eligibility made by HR 1 (P.L. 119-21)." *Id.* ¶ 15, Exhibit A.

130. The rest of M.E.'s family also lost Medicaid coverage for the same reason, and there was no difference for M.E., even though he continues to receive SSI benefits. *Id.* ¶ 16.

131. M.E.'s father works as a housekeeper in a hotel, earning about $18 an hour, and M.E.'s mother does not currently work, as she cares for M.E. and his three siblings. *Id.* ¶ 18.

132. M.E.'s family had relied on Medicaid to cover M.E.'s diapers and doctors' visits, including for a urologist, gastroenterologist, geneticist, and psychiatrist, as well as prescription medications as needed. *Id.* ¶ 12. Medicaid also covered two surgeries to help correct his genitalia, and his doctor has said that he will need one or possibly two more surgeries. *Id.* ¶¶ 13–14.

133. The family was about to schedule M.E.'s next surgery when his Medicaid was terminated, but now they have to put off the surgery because they cannot afford the cost without health insurance. *Id.* ¶ 20. Without Medicaid, his family cannot afford routine medical care for M.E. *Id.* ¶ 22. Without Medicaid, M.E.'s family will be unable to pay for M.E.'s diapers when they run out, and paying out of pocket for diapers will make it harder to pay for other household expenses, including clothes and medical care for M.E.'s three siblings. *Id.* ¶¶ 24–25.

134. The loss of Medicaid is putting the health and well-being of M.E. and his family members at serious risk. *Id.* ¶¶ 14, 20–25.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

136. Plaintiffs seek to represent the following class:

> All noncitizens who: (a) receive benefits under the Supplemental Security Income program under Title XVI of the Social Security Act; (b)

> satisfy the applicable requirements for full Medicaid coverage, apart from the restriction based on immigration status imposed by the April 8, 2026, Letter to State Health Officials; (c) do not have a status listed in 42 U.S.C. § 1396b(v)(5)(B); and (d) whose full Medicaid coverage has been or will be terminated, reduced, or denied, because they do not have a status listed in 42 U.S.C. § 1396b(v)(5)(B).

137. The proposed class meets the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. HHS is in sole possession of the information regarding the total number of potential class members across the country. On information and belief, there are thousands of qualified noncitizen SSI recipients who were terminated from Medicaid coverage, as of October 1, 2026, as a direct result of Defendants' SSI Medicaid Exclusion.

138. SSA's Annual Statistical Report for 2025 identifies 310,067 noncitizen recipients of SSI as of December 2025. Soc. Sec. Admin., *SSI Annual Statistical Report, 2025*, tbl. 31, https://www.ssa.gov/policy/docs/statcomps/ssi_asr/2025/sect05.html#table31 (last visited Nov. 24, 2026). If even one percent of those individuals are in statuses subject to Defendants' SSI Medicaid Exclusion, e.g., refugees, asylees, parolees, and other humanitarian entrants, or other statuses not listed in 42 U.S.C. § 1396b(v)(5), that would be over 3,100 individuals.

139. Evidence from Washington state suggests the percentage is likely significantly higher. SSA's statistical report for 2025 identified 5,217 noncitizen recipients of SSI in Washington as of December 2025. *Id.* Washington's Medicaid agency identified approximately 1,258 SSI-eligible noncitizens who were at risk of

losing coverage. *See* Decl. of Trinity Wilson, *Neighborhood House v. Kennedy,* No. 2:26-cv-03006-TSZ (W.D. Wash. Aug. 28, 2026), ECF No. 8. That data suggests that approximately 24% of non-citizen SSI recipients in Washington are losing Medicaid coverage.

140. In Pennsylvania, there is an adult day care center, Active Life Services, that primarily serves Ukranian immigrants. It has identified 32 clients who receive SSI benefits but have lost Medicaid due to the SSI Medicaid Exclusion. Declaration of Lubov Uminski, attached hereto as Exhibit 8, ¶¶ 5–7.

141. As demonstrated by their eligibility for SSI, individuals in the proposed class are all low-income and either elderly or disabled, limiting their ability to retain individual legal representation.

142. The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject to Defendants' unlawful statutory interpretation and instruction to states that noncitizen SSI recipients are no longer eligible for Medicaid-funded services unless they have one of the three statuses listed in 42 U.S.C. § 1396b(v)(5). The lawsuit raises questions of law common to members of the proposed class, including whether Defendants' SSI Medicaid Exclusion violates the Medicaid Act and PRWORA. Each question concerns the same federal policy applied to every member and is capable of resolution through a common answer.

143. The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the legal claims of the representative Plaintiffs are typical

of, and indeed shared by, the class. As of October 1, 2026, each of the class members has been or will be terminated from, or denied, Medicaid coverage as a direct result of Defendants' interpretation and instruction to states that certain noncitizen SSI recipients are no longer eligible for Medicaid-funded services.

144. The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same final relief as the other members of the class—namely, an order vacating and setting aside Defendants' SSI Medicaid Exclusion; declaring Plaintiffs' rights under PRWORA, and the Medicaid Act; and enjoining Defendants from implementing the SSI Medicaid Exclusion through any other means.

145. Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest that is antagonistic to other class members.

146. Plaintiffs are represented by competent counsel with extensive experience in complex class actions and administrative law.

147. The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final declaratory, APA and injunctive relief appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act: Contrary to Law, 5 U.S.C. § 706(2)(A)

148. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

149. Defendants' SSI Medicaid Exclusion constitutes final agency action reviewable under 5 U.S.C. § 704 because it marks the consummation of the agency's decisionmaking process, determines the rights or obligations of grantee states and SSI recipients, and produces legal consequences.

150. Plaintiffs and similarly situated individuals are persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" under the APA because they suffer grave harm as a result of Defendants' actions and they have lost, or will lose, the healthcare benefits protected and regulated by the Medicaid Act and PRWORA. 5 U.S.C. § 702.

151. Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

152. Defendants' SSI Medicaid Exclusion conflicts with controlling federal statutory law. PRWORA sets forth a distinct mandate that all noncitizen SSI recipients have the same access to "medical assistance under a State [Medicaid] plan" as other SSI recipients. 8 U.S.C. § 1612(b)(2)(F); *see also* 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa) (all SSI recipients shall receive "medical assistance"), (f) (establishing 209(b) option); 42 C.F.R. § 435.120 (requiring states to "provide

Medicaid to aged, blind, and disabled individuals or couples who are receiving . . . SSI").

153. Defendants' actions are contrary to law because they erroneously terminate Medicaid eligibility for SSI recipients who do not meet Defendants' immigration requirements. This directly contradicts 42 U.S.C. §§ 1396a(a)(10)(A)(i)(II)(aa), (f) and 8 U.S.C. § 1612(b)(2)(F), which H.R. 1 did not repeal or amend. Nothing in 42 U.S.C. § 1396b(v), added under H.R. 1, overrides these specific prior-enacted statutes.

154. Defendants' SSI Medicaid Exclusion, instructing states to terminate Medicaid FFP eligibility for SSI recipients who are not citizens, LPRs, Cuban or Haitian Entrants or COFA residents, must be held unlawful and set aside as contrary to law.

**COUNT II**
**Administrative Procedure Act: In Excess of Statutory Authority, 5 U.S.C. § 706(2)(C)**

155. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

156. Defendants' SSI Medicaid Exclusion constitutes final agency action reviewable under 5 U.S.C. § 704 because it marks the consummation of the agency's decisionmaking process, determines the rights or obligations of grantee states and SSI recipients, and produces legal consequences.

157. Plaintiffs and similarly situated individuals are persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" under the APA because they suffer grave harm as a result of Defendants' actions and they have

lost, or will lose, the healthcare benefits protected and regulated by the Medicaid Act and PRWORA. 5 U.S.C. § 702.

158. Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

159. No statute authorizes Defendants to impose the SSI Medicaid Exclusion. Defendants do not have authority to change who is eligible for Medicaid, nor do they have authority to instruct states to cut off Medicaid for SSI recipients based on additional unenacted immigration status criteria. Defendants therefore acted in excess of their statutory authority.

160. Defendants' SSI Medicaid Exclusion must be held unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Assume jurisdiction over this action;

b. Certify the case as a class action as proposed herein and in the accompanying motion for class certification;

c. Hold unlawful, vacate, and set aside the SHO Letter, Implementation Tool and Technical Guide, (collectively SSI Medicaid Exclusion) under 5 U.S.C. § 706;

d. Declare that the SSI Medicaid Exclusion is unlawful under the APA because the Medicaid Act and PRWORA mandate that all SSI recipients who meet the categorical eligibility requirements for Medicaid in their state

are entitled to federally-funded Medicaid benefits regardless of their immigration status;

e. Stay the SSI Medicaid Exclusion pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve the status quo for the pendency of this litigation;

f. Preliminarily and permanently enjoin Defendants Oz and Kennedy, their successors, their agents, and all persons acting in concert or participation with Defendants from implementing the SSI Medicaid Exclusion, including prohibiting Defendants from denying, withholding, or disallowing FFP for medical assistance furnished to class members on the basis of the SSI Medicaid Exclusion;

g. Order Defendants, within 48 hours of entry of the Court's order, to file a notice confirming that they have informed all states participating in Medicaid of the Court's order;

h. Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

i. Grant such other relief as the Court deems necessary, just, and proper.

Dated: November 24, 2026

Respectfully submitted,

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar No. 8262)
Kevin Love Hubbard (MA Bar No. 704772)*
Juan Bedoya (MA Bar No. 706954)*
LAWYERS' COMMITTEE FOR RHODE ISLAND
56 Pine Street, Suite 200
Providence, RI 02903
(401) 238-3953

Amy@lawyerscommitteeri.org
Kevin @lawyerscommitteeri.org
Juan@lawyerscommitteeri.org

Abigail Coursolle (CA Bar No. 266646)*
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
Telephone: (310) 736-1652
Coursolle@healthlaw.org

Sarah Grusin (IL Bar No. 6316896)*
Jane Perkins (NC Bar No. 9993)*
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Telephone: (984) 278-7665
Grusin@healthlaw.org

Lynette Labinger (RI Bar No. 1645)
128 Dorrance Street
Providence, RI 02903
(401) 465-9565
LL@labingerlaw.com
Cooperating counsel,
ACLU FOUNDATION OF RHODE ISLAND

* Pro Hac Vice pending